ATTACHED:

EXHIBIT A- LEGAL NOTICES

EXHIBIT B- COURT ORDER

EXHIBIT C- EXHAUSTION OF ADMINISTRATIVE REMEDY WITH BOP

I, Julia Teryaeva-Reed, certify that copies of the foregoing were sent to all named Respondents via First

Class Mail postage pre-paid:

Colette S. Peters, Director FBOP    USPS CeRtiFied MaiL
                                    # 7011 3500 0001 4672 1105

Central Office HQ

320 First St NW

Washington, DC 20534

William W. Lothrop, Deputy Director FBOP   USPS CeRtiFied MaiL
                                           # 7011 3500 0001 4672 1105

Central Office HQ

320 First St NW

Washington, DC 20534

Kathleen Toomey Associate Deputy Director FBOP

USPS Certified Mail
# 7011 3500 0001 4672 1105

Central Office HQ

320 First St NW

Washington, DC 20534

Seth Bogin Acting Chief Executive Office Federal Prison Industries

USPS Certified Mail
# 7011 3500 0001 4672 1105

Central Office HQ

320 First St NW

Washington, DC 20534

Melissa Rios-Marques

USPS Certified Mail
# 9589 0710 5270 0134 0816 37

Federal Bureau of Prisons Western Regional Office

7338 Shoreline Dr.

Stockton, CA 95219

United States Attorney General

USPS Certified Mail
# 9589 0710 5270 0957 4144 14

950 Pennsylvania Ave NW Suite 11000

Washington, DC 20530

20

# Exhibit A

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 04/30/2024 07:31:22 PM

To: Warden, Ms, SERRANO
Inmate Work Assignment: part 1

FDC MIAMI
R. Morris DBA R. MORRIS, associate warden;
R. Taylor DBA R. TAYLOR, captain;
Ms. Serrano DBA Ms. SERRANO, Warden, et al
in individual and official capacity;

<center>LEGAL NOTICE<br>by Affidavit</center>

<center>*NOTICE TO AGENT IS NOTICE TO PRINCIPAL AND NOTICE TO PRINCIPAL IS NOTICE TO AGENT*</center>

I, Julia Teryaeva-Reed, a secured party creditor, agent and representative in behalf of JULIA TERYAEVA-REED, Ens. Legis, hereinafter the "Affiant" by special appearance, in private capacity, with full authority, standing and authorization, duly serve this notice electronically on R. Morris DBA R. MORRIS; R. Taylor DBA R. TAYLOR; Ms. Serrano DBA Ms. SERRANO, their agent/successors/assigns, in individual and official capacity, hereinafter the "Respondents" as to the following violations of FBOP Policy, Federal Law and Constitutional rights:

1. THAT, the transfer of the Affiant was in violation of judicial court order issued by judge Yvonne Gonzales Rogers on April 15th, 2023 that mandated in part that BOP "to ensure inmates are transferred to CORRECT location. This includes whether an inmate should be released to a BOP facility, home confinement, or halfway house, or granted compassionate release. The result of these case reviews and transfer designations SHALL be reviewed with the Special Master PRIOR to transfer." Special Master, Wendy Still, was assigned to approve the transfer and designation of the inmates. See California Coalition for Women Prisoners, et al. v. United States Bureau of Prisons, et al. Case No. 4:23-cv-4133-YGR, 2024 WL 1290766 (N.D. Cal. Mar. 15, 2021). Doc. 252. As you know there was no such review performed and no further approval of the transfer/designation of the Affiant by Special Master, Wendy Still, clearly in violation of the judicial order.

2. THAT, detention in MDC Miami is in violation of the Fourteenth Amendment's Due Process Clause that protects against deprivation of "life, liberty, or property without due process of law". In the prison context where "prisoners have already been deprived of their liberty in the ordinary sense of the term, two situations may present themselves where a prisoner may be further deprived of their liberty and due process" Bass v. Perrin, 170 F. 3d 1312, 1318 (11th Cir. 1999). "The first is when a change in prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court" (such as being transferred to a pre-trial facility that lacks work and programming opportunities MANDATED by the First Step Act that can result in sentence reduction and affect classification). See Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300, 123 L. Ed. 2d 418 (1995). "The second is when the state has consistently given a certain benefit to prisoners...and deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" such as deprivation of good-time credits. (quoting Sandin, 515 U.S. at 484, 115 S. Ct. at 2300). See Wilkinson v. Austin, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393, 162 L. Ed. 2d 174 (2005). "A liberty interest may arise from the Constitution itself...or it may arise from an expectation or interest created by state laws or policies". Here, liberty interest is created in adequate access to law library, outdoor recreation, video visit, work and programming opportunities and excessive lockdown times.

3. THAT, FDC Miami, where Affiant is currently detained operates in violation of Federal Law, FBOP Policies and Constitutional rights of prisoners. Additionally the operation of the facility at FDC Miami is a far departure from other BOP prisons due to:

LACK OF OUTDOOR RECREATION: The courts have held that "the Constitution REQUIRES jail officials to provide OUTDOOR recreation opportunities, or otherwise meaningful recreational opportunities to prison inmates" Shorter, 895 F. 3d at 1185-86, see also Pierce v. Cty of Orange, 526 F. 3d 1190, 1208 (9th Cir. 2008);

LIMITED ACCESS TO LAW LIBRARY AND ACCESS TO COURTS CLAIM: "access to courts is a constitutional right grounded in the First Amendment, Art. IV Privilege and Immunities Clause, the Fifth Amendment, and the Fourteenth Amendment" Chappell v. Rich, 340 F. 3d 1279, 1282 (11th Cir. 2003). See Supreme Court decision in Christopher v. Harbury, 536 U.S. 403, 415 n. 12, 122 S. Ct. 153 L. Ed. 2d 413 (2008). In order to pass constitutional master the access allowed must be more than a



TRULINCS  57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------------------------------------

mere formality. The access must be "adequate, effective, and meaningful."

 #1

4/30/24 NOTICE - part 2

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 04/30/2024 08:40:20 PM

To: Ms. Serrano, Warden and/or successor/assigned
Inmate Work Assignment: part 2

LEGAL NOTICE- continued part 2

EXCESSIVE LOCKDOWN TIMES: approximately 1 hour each time for 2 census counts and 1.5 hours during lunch and evening mainline (2 tiers beings locked down and trays given to inmates on 1 tier at a time), plus count times from 3:30-5:30, totaling at least 6-7 hours excessive lockdown. Census counts take on average 15 minutes and not 1-2 hours like in FDC Miami, there is no lockdown during mainline in the ordinary course of prison life in all other BOP prisons.

LIGHTS NOT REGULATED: At FDC Miami the lights inside cells turn on at 6 am and get turned off at 11pm and are not regulated (can not be turned off by inmates). In other prisons it is a practice used for SHU detention (Special Housing Units) where lights come on at 6am and get turned off at locked down time, 9pm or 10pm, depending on the prison. Affiant did not violate any BOP rules or regulations to be subjected to such punitive detention.

LACK OF PROGRAMMING AND WORK OPPORTUNITIES. It is a violation of the First Step Act, enacted in 2018, 18 U.S.C. Sec. 3632, and FBOP Program Statement 5220.01, that mandate that EVERY inmate should be afforded an opportunity to work AND program. Affiant was employed at UNICOR call center in FCI Dublin where wages could be $200-300/month within 3-6 months of employment and was earning FSA time credits. FCI Miami offers no job and limited programming opportunities. Affiant has exhausted her programming for the past 10 years in prison system and has no classes she can take in FCI Miami. Thus, Affiant's transfer to FDC Miami is in violation of the FBOP policy and First Step Act, federal law.

NO VIDEO VISITS AND 1 HOUR LIMITED IN PERSON VISITS. Video Visits were offered at no cost under the CARES ACT and are not available to Affiant in FCI Miami, in person visits are limited to 1 hour while other prisons allow 6am-2pm (1-2 days) visits. It is in violation of Federal law not to provide benefits that were made available for prisoners, including Affiant in the instant case.

Overall, the detention in FCI Miami is commensurate to a SUPER MAX or SHU (special housing unit) detention, Affiant did not violate any FBOP policy and her classification has not changed to be placed in FCI Miami that operates in violation of federal law, fbop policy and violates numerous constitutional rights of the Affiant.

Lastly, Respondents are herein NOTICES that they are an accommodation party in a wrongful conviction claim under which Affiant is held illegally in custody at FCI Miami as surety/collateral for debt notes obligations that were duly discharges as a matter of law, under HJR-192. See Case No. 1:23-cv-03225

I, Julia Teryaeva-Reed, the herein request that Respondents CEASE AND DESIST further detention of the undersigned in their custody and FORTHWITH initiate a TRANSFER of the Affiant to FCI-Tallahassee, pursuant to the recommendation of the judge Russell at sentencing. See Criminal Case No. 1:14-cr-00207-GLR.
In the alternative the affiant will be seeking damages in the amount of $10,000,000.00 per day, as of the day of this electronic notice, for further detention in FCI Miami. The undersigned reserves the right to amend this notice without affecting its effective date and to add/remove respondents under necessity. The undersigned intends on filing a tort claim and a lien against respondents once this private administrative remedy is complete.

Respectfully Submitted,

By: Julia Teryaeva-Reed

CERTIFICATE OF SERVICE

I, Julia Teryaeva-Reed, hereby certify under the penalty of perjury under the laws of the United States of America that I served this LEGAL NOTICE electronically on the above named respondents via internal electronic communication and said LEGAL NOTICE was forwarded electronically to ALL named respondents.

Date: 4/30/24                                    By: Julia Teryaeva-Reed

LAW LIB
ACCESS TO COURTS

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 05/25/2024 09:22:44 PM

To: Ms. Serrano and/or her successor/assigned
Inmate Work Assignment: ACCESS TO COURTS RIGHT -1

Dear Ms. Serrano,
I am herein writing to NOTICE you that my right to access courts is violated.

   At FDC Miami inmates have no law library access, no copier, no typewriter, no required legal materials, no easily accessible
legal phone- all in violation of the First, Fifth and Fourteenth Amendments; and BOP Policy, Federal Law.
   Under the First Amendment inmates have the right to "petition the government for a redress of grievances", and under the
Fifth and Fourteenth Amendments inmates have a right to a "due process of law". The right is referred to as "THE RIGHT TO
ACCESS COURTS". PS 1315.07 outlines requirements for "Inmate Legal Activities".
   The Supreme Court established that prisoners have a fundamental right to access the courts in a series of important cases,
including Ex Parte Hull, 312 U.S. 546 (1941), Johnson v. Avery, 383 U.S. 483 (1969), and Bounds v. Smith, 430 U.S. 817
(1977). The rights is so fundamental that it REQUIRES a prison to fund a way for inmates to have A MEANINGFUL ACCESS
TO COURT. Prisons are REQUIRED to provide access to a decent LAW LIBRARY or they can hire people to help inmates with
their cases.
   FDC Miami offers no law library and hires no qualified personnel to help inmates with their legal work.
Such deprivation of law library is also in violation of BOP Policy, PS 1315.07. "Inmates Legal Activities" 28 CFR 543.10 states
that:  "The BOP affords an inmate reasonable access to legal materials and counsel, and reasonable opportunity to prepare
legal documents. The Warden shall ESTABLISH AN INMATE LAW LIBRARY; and procedures for access to legal reference
materials and to legal counsel, and for preparation of legal documents". That program statement lists REQUIRED legal
materials in Exhibit A. And in 28 CFR 543.11 you can find more information on what is required for  "legal research and
preparation of legal documents".
   All inmates that were transferred from FCI Dublin are a "protected class" of a PENDING/ONGOING class action and MUST
have a meaningful access to courts. Additionally, many, including myself, have other open cases for sentence reduction under
18 U.S.C. Sec. 3582(c)(2); compassionate release motions under 18 U.S.C. Sec. 3582(c)(1)(A)(i), Habeas Corpus petitions and
tort claims that require meaningful access to law library and a qualified personnel or experienced law librarian.
   Federal Courts have held that prison libraries must provide legal materials, tables, chairs, typewriters, copiers, printers, be of
adequate size, and be open for prisoners to use for a reasonable amount of time. The books that are requires are"
-Relevant State and Federal Statutes
-State and Federal Law Reporters from past few decades
-Shepard's Citations
-Basic Treaties on Habeas Corpus, prisoner's civil right and criminal forms, and others listed in Exhibit A in PS 1315.07 Inmate
Legal Activities.

EXCESSIVE LOCK DOWN TIMES
   It should be noted that prison lockdown should not interfere with prisoner's rights to access courts. In Hebbe v. Pliler, 627 3d.
338 (9th Cir. 2010) the court held that denying prisoner's access to law library due to prison lockdown and causing to miss a 30-
day deadline violated his right to access courts.
In Allah v. Seiverling, 229 F. 3d 220 (3rd Cir. 2020) it was held that prison officials must not use transfer and segregations to
restrict prisoner's right to access courts.
   In FDC Miami inmates are locked down two times for census counts (8am and 1pm), three times for meals, for 4pm count and
then at night for 10pm count. The lockdown times during the day total at least 6 hours of UNNECESSARY lockdown time, in
addition to institutional lockdowns done for other reasons. Such lockdown policy is not practiced in any other BOP prisons, is
too restrictive, allowing inmates insufficient time to do legal work and legal phone calls.
   In Kauffman v. Schneiter, 474 F. Supp, 2d 1014 (W.D. Wisc. 2007) the court found an Eighth Amendment violation when a
prisoner was forced to choose between using limited out-of-cell time for exercise or access to the law library.
   Federal courts have held that prisoners who cannot visit the law library because they are in disciplinary segregation or other
extra-restrictive conditions must have MEANINGFUL ACCESS TO COURTS so other way. See Trujillo v. Williams, 465 F. 3d
1210 (10th Cir. 2006); Marange v. Fontenot, 879 F. Supp 679 (E.D. TX 1995).

TRULINCS　57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E　*access TO COURTS*

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 05/25/2024 09:30:46 PM

To: Ms. Serrano and/or her successor/assigned
Inmate Work Assignment: ACCESS TO COURTS RIGHT-2

NOTICE- continued

ACCESS TO JAILHOUSE LAWYER/LAW LIBRARIAN
It was held in Johnson v. Avery, 393 U.S. 483 (1969) that "Inmates have a right to get help from jailhouse lawyer or a law librarian unless prison provides some reasonable alternative to assist prisoners in the preparation of petitions". Same was held in Bear v. Kautzky, 305 F. ed 802 (8th Cir. 2002).
Again, FDC Miami offers no law library, no law librarian or jailhouse lawyer.

LEGAL COPIES
The issue with legal copies is two fold. One, according to the MEMO posted by C. Brown, supervisor of education, legal copies can be made after a request is submitted electronically by Tuesday, the documents are then picked up on Wednesday and the copies are made by Monday, the following week. One, legal copies are subject to the 4th Amendment protection, expectation of privacy. See Robinson v. Gunja, 92 F. Apps 624 (10th Cir. 2004) and two it is not practical to obtain copies in a timely manner, especially due to numerous institutional lockdowns and inconsistency with the operation of the institution.

LEGAL PHONE
Unlike in FCI Dublin there is no easily accessible legal phone on the unit.

We are asking to remedy the situation, subject to further litigation and claim for damages.
Thank you for you attention in this matter.

 

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 05/28/2024 03:18:53 PM

To: Ms. Serrano, and/or her successor/assigned
Inmate Work Assignment: LACK OF OUTDOOR RECREATIO

Dear Ms. Serrano,
  In reference to OUTDOOR RECREATION, a LEGAL NOTICE was electronically submitted to you on 4/30/2024 a 8:31:22pm, and continuation of said notice (part 2) on 4/30/2024 at 8:40:22pm, stating in part that: "the Constitution REQUIRES jail officials to provide OUTDOOR recreation opportunities, or otherwise meaningful recreational opportunities to prison inmates." Shorter, 895 F. 3d at 1185-86, see also Pierce v. Cty of Orange, 526 F. 3d 1190, 1208 (9th Cir. 2008).

  I am herein adding to said LEGAL NOTICE the following in reference to OUTDOOR RECREATION.

1. DEPRIVATION OF OUTDOOR RECREATION IS IN VIOLATION OF THE EIGHTH AMENDMENT

  Ninth Circuit held it to be a violation of the Eighth Amendment when prisoners are deprived of OUTDOOR exercise for long periods of time. Hearns v. Terhune, 413 F. 3d 1036 (9th Cir. 2005). In McGray v. Lee, 963 F. 3d 110 (2nd Cir. 2020) it was held that lack of exercise due to snow in outdoor exercise yard constitutes Eighth Amendment violation. In Keenan v. Hall, 83 F. 3d 1083, 1089 (9th Cir.. 1996) and in Delaney v. DeTella, 256 F. 3d 679 (7th Cir. 2001) it was held that prison must provide prisoners with opportunities to exercise outside their cells; prisons must provide adequate space and equipment.
  The exercise area provided in FDC Miami is NOT OUTDOOR and is not adequate in size to provide meaningful opportunity for recreation, rehabilitation, and exercise.

  In Davis v. Baldwin, United States District Court South District of Illinois, Case No. 3:16-cv-600-MAB, it was held that restrictive housing violated Eighth Amendment and that inmates have "protected liberty interest in avoiding extreme isolation." The Plaintiff's expert witness, Dr. Hanley, a professor of psychology for University of California, Santa Cruz, in his opinion testified to the numerous detrimental effects posed by restrictive housing, that produce a "host of series adverse cognitive, emotional, behavioral, and physical impairments, which can cause permanent and irreparable damage to a person's overall psychology and physical functioning."

2. DEPRIVATION OF OUTDOOR RECREATION IS A VIOLATION OF THE FOURTEENTH AMENDMENT
Deprivation of outdoor recreation is a violation of the Fourteenth Amendment "equal protection under the law." Equal protection means that a prison cannot treat some prisoners different than it treats others. While outdoor recreation is available in other BOP facilities, FDC Miami has no outdoor recreation.
In Wilkinson v. Austin, 545 U.S. 209 )2--5_ ot was held that transfer to supermax facility where there was almost no human contact, 24-hour lighting, and NO OUTSIDE RECREATION was a violation of the Fourteenth Amendment under Sandin standard. In Aref v. Lynch, 833 F. 3d 242 (D.C. Cir. 2016) the court decided that transfer to CMU ("Communications Management Unit") created protected liberty interest under Sandin and violated Fourteenth Amendment.
  The conditions at FDC Miami is a far departure from the sentence intended and imposed by the sentencing court. Federal sentencing times are very long and for that reason courts require the conditions to be humane, conductive to rehabilitation, providing for work and programming opportunities, and meaningful social contact to ensure successful re-entry. The sentencing court imposed a maximum term of 162 months in my case. Prior to being sentenced I spent 3 years and ten months in pre-trial facilities, considered "hard time". The conditions in pre-trial facilities were comparable to FDC Miami. In FCI Aliceville, I spent close to 3 years on LOCKDOWN due to COVID-19. Inmates were locked in for as long as 23.5 hours a day in their 6-9 cells with no outside REC for years. I experiences several panic and anxiety attacks and health issues that were related to lockdown. I am currently suffering from psychological conditions, PTSD, anxiety, numerous triggers that are related to lockdowns and to me it is extremely detrimental to be confined in the same conditions again, especially approaching my release. My health has been deteriorating as well due in part due to lack of movement (I was given doctor's orders to exercise for my sciatic nerve damage) and in part due to psychological trauma. It affects my mental health, overall well being, productivity and all areas of my life.
  I am asking to remedy the situation, to allow me outdoor recreation offered by all other facilities within BOP, or, in the alternative to transfer me to FCI-Tallahassee, in accordance to sentencing court's recommendation.
Failure to do constitutes deliberate indifference, breach of official duty and will be subject to further litigation and claim for monetary damages. Thank you for your attention in this matter.

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E   RELIGIOUS SERVICES
-----------------------------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 05/18/2024 09:08:51 AM

To: Ms. Serrano and/or her successor/assigned
Inmate Work Assignment: na

-----TERYAEVA-REED, JULIA on 5/18/2024 9:04 AM wrote:

>

I have not received any response or resolution to my request to attend religious services and to practice my religion. In my last e-mail I stated that there is no chapel on our unit, but a room with books that does not lock and constant traffic, and it is not adequate to meaningfully practice my religion. I am requesting to remedy the situation and to afford me an opportunity to practice my religion. You are herein given a legal notice that exclusion of Buddhist services is in violation of numerous Constitutional Rights and Federal Law and is subject to legal action. You will be named as respondent in individual and official capacity.

LEGAL NOTICE
***NOTICE TO AGENT IS NOTICE TO PRINCIPAL AND NOTICE TO PRINCIPAL IS NOTICE TO AGENT***
I, Julia Teryaeva-Reed, herein noticing you that deprivation of religious services, specifically Buddhist, is in violation of First and Fourteenth Amendments of the United States Constitution and Federal Law.

FIRST AMENDMENT
   The free Exercise Clause of the First Amendment to the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or PROHIBITING THE FREE EXERCISE thereof..." See Africa v. Commonwealth of Pennsylvania, 662 F. 2d 1025 (3rd Cir. 1981); Love v. Reed, 216 F. 3d 682 (8th Cir. 2000).

FOURTEENTH AMENDMENT
   The fact that religious services are provided to other religions but not Buddhist is also a violation of the Fourteenth Amendment that provides "equal protection under the law" meaning that a prison CAN NOT make special rules or give special benefits to members of only one religion or group and exclude the other(s). See Benjamin v. Coughlin, 905 F. 2d 571 (2nd Cir. 1990); Cruz v. Beto, 405 U.S. 319 (1972); Hartman v. Cal. Dep't of Corr. and Rehab., 707 F. 3d 1114 (9th Cir. 2013).

FEDERAL LAW: RFRA and PLUIPA
   My inability to attend religious services and practice Buddhism is a violation of The Religious Freedom Restoration Act (RFRA) and the Religious Land Use and Institutionalized Persons Act (RPLUIPA).
   In 2005 the United States Supreme Court found RLUIPA constitutional in Cutter v. Wilkinson, 544 U.S. 709 (2005). The Court held that facilities that ACCEPT FEDERAL FUNDS CANNOT DENY prisoners the necessary accommodations to engage in activities for the practice of THEIR OWN RELIGIOUS BELIEFS.
   "Religious accommodations" is defined under federal law as "a RIGHT to meet with a religious leader and to attend religious services of YOUR FAITH".
   In other words, if the institution is ACCEPTING ANY FEDERAL FUNDS, the Religious services should not be denied to anyone, including Buddhist. There is clearly a RIGHT that is being violation under the Federal Law.

PRAYER FOR RELIEF
   I am herein requesting that adequate religious services are provided and that I am given an opportunity to meaningfully practice my Buddhist religion. I am requesting to be able to meet with a "spiritual leader" and to attend church and meditate for one hour a day. In the alternative, I am requesting monetary damages in the amount of $10,000,000.00 be awarded and reserve the right to add respondents, and to amend the complaint, under necessity and otherwise. I am also requesting INJUNCTION, specifically, to cease and desist the receipt of ANY FEDERAL FUNDS if everyone in FDC Miami is not afforded an opportunity to practice THEIR religion and to have adequate means and opportunity to do so, subject to class action and other punitive damages.
-----Chaplain on 5/3/2024 9:57 AM wrote:

>

there s a chapel on your unit. feel free to use this

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E     RELIGIOUS SERVICES

----------------------------------------------------------------------------------------------------

From: ~^! TERYAEVA-REED, ~^!JULIA <57914037@inmatemessage.com>
Sent: Thursday, May 2, 2024 10:21 PM
Subject: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E

To: Chaplain
Inmate Work Assignment: na

Dear Sir/Madam,
I was transferred from FCI Dublin. I am Buddhist and I do daily meditations for 1 hour a day. In Dublin I was able to do it in my cell when my bunkmate went to work or REC. I also went to Church there that offered Buddhist meditation services. I was also detained to FCI Aliceville and they have huge REC area where I was able to go and mediate. In FDC Miami we have no jobs and no outdoor recreation and basically do not go anywhere. It is problematic for me to do my meditations in my cell because we are on lockdown half the time and my bunkmate in has a store and there is constant traffic. It is my religious belief and I am asking for your permission to go to Church daily to do my meditations please. I do not need any accommodations just the space. I spoke to Ms.. Riley today, she said she would e-mail/contact you as well. Thank you so much.

#5    VIDEO VISITS - PART 1

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: Warden
TO: 57914037
SUBJECT: RE:***Inmate to Staff Message***
DATE: 05/28/2024 12:27:01 PM

Per Legal Dept.

FDC Miami offers visiting with family, friends, and community groups consistent with Program Statement 5267.09 CN-1, "Visiting Regulations." Due to practical considerations and the characteristics unique to an administrative institution, PS 5267.09 CN1, recognizes that certain limitations are necessary to administer the visiting regulations, however, all inmates are permitted visits by family, friends, and community groups consistent with the security and orderly running of the institution. Adults in Custody (AICs) are allowed a minimum of four hours visiting time per month and exceptions may be approved when indicated by special circumstances, such as the distance the visitor must travel, frequency of the AIC's visits, or health problems of the AIC or visitor.

--------------------------------------------------------------------------------

From: ~^! TERYAEVA-REED, ~^!JULIA <57914037@inmatemessage.com>
Sent: Friday, May 24, 2024 5:46 PM
Subject: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E

To: Ms. Serrano and/or her successor/assigned
Inmate Work Assignment: VIDEO VISITATION ISSUE

Dear Ms. Serrano, I am writing to NOTICE you that:

PERMANENT BAN ON VIDEO VISITS AND RESTRICTED 1-HOUR VISITATION PRIVILEDGES are in violation of the First Amendment right to freedom of association, Eighth Amendment right to be free from cruel and unusual punishment, Fifth and Fourteenth Amendment rights to substantive due process, equality under the law and procedural due process.

In Hallal v. Hopkins, 947 F. Supp. 978 (S.D. Miss. 1995) it was held that visits may only be banned if there is a justified security need. Likewise it was held in Ryes v. Caruso, 1:08-cv-516, 2009 U.. Dist. LEXIS 82839 (W.D. Mich. July 20, 2009) that a permanent ban on visitation was unconstitutional relying on Supreme Court decision in Overton v. Bazetta.

Women in FDC-Miami, including myself, have NO access to video visitation while all other prisons within FBOP provide such privileges, and under the CARES ACT video visitations was made free and unlimited. As I am approaching my release it is absolutely essential for me to maintain social contact with outside world to ensure successful re-entry.
I am asking to remedy the situation as it is not only unfair but also violates Fourteenth Amendment right that guarantees "equal protection of the law". Equal protection means that a prison cannot treat some prisoners differently than it treats others without a reason.
Women in FDC Miami, including myself, are treated differently than other women detained in other BOP facilities. Restriction on video visitation privileges is ordinarily imposed as a punishment or sanction for violation of the BOP policy (restriction of 60-90 days is ordinarily imposed for an 100, 200 or 300-series incident report). In other words, women at FDC Miami are being severely punished for no violation of BOP policy; moreover a PERMANENT BAN on video visitation is unconstitutional. See Whitmire v. Arizona, 298 F. 3d 1134 (9th Cir. 2002) holding equal protection clause of the Fourteenth Amendment applies to visitation privileges, same in Doe v. Sparks, 733 F. Supp. 227 (W.D. Pa. 1990).
PERMANENT BAN on video visitation privileges and 1-hour restricted visitation (compared to 2 full days in other prisons) is a dramatic departure from the accepted standards for conditions of confinement and creates inhumane prison conditions, in deprivation of basic human necessities. Such policy also affects women's mental health and physical well being; inflicts unnecessary pain and suffering; and if not remedied upon this notice will be considered DELIBERATE INDIFFERENCE.
Permanent ban on video visitation and restricted 1-hour in person visitation privileges also constitute procedural due process violation under the Fourteenth Amendment as it constitutes "atypical and significant hardship on the prisoner in relation to the ordinary incidents of prison life." See Supreme Court case Sandin v. Conner, 515 U.S. 472 (1995) and Aref v. Lynch, 833 F. 3d 242 (D.C. Cir.. 2016) (Prisoners were successful challenging transfer to CMU where they were not allowed contact visits. The court held that CMU prisoners have a protected liberty interest in avoiding CMU and were entitled to due process protection under the Fourteenth Amendment).
United States is a party to and ratified The 1976 Intl Convention on Civil and Political Rights (ICCPR) containing numerous protections for prisoners; The 1948 Universal Declaration on Human Rights (UDHR) which guarantees that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment (UDHR outlines many basic rights to life, liberty, and security, and the right to ADEQUATE STANDARD OF LIVING); the 1984 Convention Against Torture Act (CAT) (prohibiting

#5

VIDEO VISITS - PART 2

TRULINCS  57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

intentional infliction or severe physical OR MENTAL PAIN); the Convention on the Elimination of All Forms of Racial Discrimination (CERD) (prohibiting racial and ethnic discrimination). These Conventions and Treaties comprise international law that outline basic standards of living conditions and treatment of prisoners that should be humane and non-discriminatory. By not allowing women in FDC Miami to have video visitations and adequate times for in-person visits  constitutes discrimination against similarly situated women-prisoners confined in other BOP locations.

I am asking to resolve this in reasonable time and to afford women in FCD Miami to have video visitations and adequate time for in-person visits. Failure to do so within 10 days will be subject to claim for monetary damages and further litigation. Thank you for your attention in this matter.



#6

WORK/ PROGRAMMING

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 05/31/2024 01:37:39 PM

To: Ms. Serrano, Warden, and/or her successor/assigned
Inmate Work Assignment: WORK/PROGRAMMING OPPORTUN

Ms. Serrano,
I am herein writing to NOTICE you that: DEPRIVATION OF WORK AND PROGRAMMING OPPORTUNITIES is in VIOLATION of numerous CONSTITUTIONAL RIGHTS, FEDERAL LAW and BOP POLICY.
VIOLATION OF FEDERAL LAW: First Step Act, hereinafter "FSA" codified in Title 18 Sec. 3632, 3621 mandates that ALL PRISONERS are given work and programming opportunities. Specifically, 18 U.S.C. Sec. 3632(a)(5)(A) states that: "ALL PRISONERS are to be assigned to appropriate evidence-based recidivism reduction programs or productive activities" to ensure that (A) ALL PRISONERS are able to successfully participate in such programs.
    Title 18 U.S.C. Sec. 3632(b) stipulates that "assignment of evidence-based recidivism reduction programs and productive activities shall be assigned for each prisoner" so as to most effectively lower risk of recidivism. Given the opportunity to work and program would result in reduction of my classification, reduction of recidivism, and would translate in reduction of my projected release date and then apply towards reduction of required term of probation.
    Pursuant to 18 U.S.C. Sec. 3621 "EVERY PRISONER" should be given "the opportunity to participate in and complete the type and amount of evidence-based recidivism reduction programs or productive activities they need and be reassessed for recidivism risk".
VIOLATION OF BOP POLICY: FBOP PROGRAM STATEMENT 5220.01 mandates that "EVERY INMATE" should be afforded an opportunity to work AND program. FDC Miami offers no meaningful work or programming opportunities as it is predominantly male prison with few opportunities given to women. "Prisons are REQUIRED to provide rehabilitative services as part of their sentence", see Women Prisoners of District of Columbia Dept. of Corrections v. District of Columbia, 93 F 3d 910 (D.C. Cir. 1996).
CONSTITUTIONAL RIGHTS VIOLATIONS: FOURTEENTH AMENDMENT
    Equal protection Clause of the Fourteenth Amendment prohibits discrimination based on sex or gender. One example of gender discrimination is a prison system that has a rule that only prisons with 2,000 prisoners or more get college programs, where women's prisons are to small to qualify. See Pitts v. Thornburgh 866 F. 2d 1450 (D.C. Cir. 1989). In FDC Miami men constitute majority of the prison population and are given significantly more work and programming opportunities.
In Sassman v. Brown, 99 F. Supp. 3d 1223 (E.D. Ca 2015) the court held that both male and female inmates should have access to "alternatives-to-incarceration program" and that providing programming to one group based on their gender and not the other was DISCRIMINATORY and VIOLATED Fourteenth Amendment right.
    Numerous courts ruled in favor of prisoners based on work and programming discrimination, protected under the Fourteenth Amendment. See Bostock v. Clayton County, 140 S. Ct. 1731 (2020); Davis v. Prison Health Services, 679 F. 3d 433 (6th Cir. 2012); Johnson v. Knable, 1988 WL 119136 (4th Cir. 1998) Counce v. Kemma, 2005 WL 579588 (W.D. Mo 2005).
CLASS ACTION: The Court ruled in favor of women in a landmark class action case in Michigan, Glover v. Johnson, 478 F. Supp. 1075 (E.D. Mich. 1979) based on equal protection clause of the Fourteenth Amendment. Women challenged the educational opportunities, vocational training, prison industry and work pass programs, wage rates, and library facilities they were provided. Although prison officials tried to argue that it was impractical and too expensive to provide smaller population of women the same level of services that they provided to men, the court ruled in favor of women and ordered a series of injunctions. In McKibben v. McMahon, 2015 WL 10382396 (S.D. Cal. 2015) prisoners won a class action challenging their denial of educational opportunities, including occupational training and GED, and drug rehabilitation programs.
    Prisoners also have a liberty interest in good time credits that could lead to early release, see Wolff v. McDonnell, 418 U.S. 536 (1974), same in Montgomery v. Anderson, 262 F. 3d 641 (7th Cir. 2001)
    I've been on waiting list for Anger Management since 2018 on waiting list for Drug Program since around 2020-2021; and I was recommended for RDAP and mental health (FIT) programs by the sentencing court. I do not have opportunity to program in FDC Miami, as was intended by the sentencing court, as part of my sentence. FDC Miami does not offer programs that could substantially reduce the length of my sentence, or any work opportunities.
IN FCI Dublin I was employed at UNICOR where inmates earn on average $200-300/months and 500 hours under the First Step Act. In MDC Miami the only off-unit job is laundry that pays $5.00 (five dollars)/months and offers no time reduction under the FSA. I am asking to remedy the situation, to provide meaningful employment opportunities with decent wages and programming to all women in FDC Miami, including myself. Failure to do so will be subject to further litigation and claim for damages. Thank you for your attention in this matter.

ILLEGAL TRANSFER



TRULINCS  57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 06/04/2024 02:49:34 PM

To: Ms. Serrano and/or her successor/assigned
Inmate Work Assignment: ILLEGAL TRANSFER NOTICE

***NOTICE TO AGENT IS NOTICE TO PRINCIPAL AND NOTICE TO PRINCIPAL IS NOTICE TO AGENT***

   Ms. Serrano, you are herein NOTICED that my transfer from FCI Dublin to FDC Miami was illegal, in violation of the court order. My continued detention at FDC MIAMI makes prison officials at FDC Miami an "accommodation party" to said illegal transfer. In addition such transfer is in violation of numerous constitutional rights.

   Specifically and particularly, in Castle v. Clymer, 15 F. Supp. 2d 640 (E.D. Pa 1998) the court held that prison officials violated the constitution when they transferred a prisoner in response to letters he had written to a journalist. The court found that because there was no security risk, the transfer was unreasonable. Likewise, I posed no security risk to BOP and the transfer was in retaliation to other inmates at FCI Dublin exercising their First Amendment right.

   The transfer from FCI Dublin to FDC Miami, a pretrial facility that houses mostly male prisoners and comparable to Supermax creates "atypical and significant hardship on prisoner in relation to the ordinary incidents of prison life" under Supreme Court case that established standard of review for Fourteenth Amendment violations, Sandin v. Connor, 515 U.S. 472 (1995). In my case, the transfer resulted in interruption of work and programming, loss of wages and other income, loss of property, loss of social ties, loss of contact with friends due to no video visitation at FDC Miami, loss of ability to practice Buddhist religion, loss of meaningful access to outdoor recreation, access to law library. FDC Miami is comparable to Supermax it that is has excessive lock down times, punitive living conditions (lights are on from 6am to 11pm and not regulated resulting in sleep deprivation, inappropriate mattress sizes comparable to SHU, constant plumbing issues, elevators not working resulting in lockdowns); living conditions at FDC Miami cumulatively constitute "atypical and significant hardship" in relation to the ordinary life.
   In Wilkinson v Austin, 545 U.S. 209 (2005) the court held that transfer to Supermax violated Fourteenth amendment rights. In Aref v. Lynch, 833 F. 3d 242 (D.C. Sir. 2016) the court held that transfer to CMU violated prisoner's constitutional rights. It is important to differentiate that while most transfers to higher security prisons are a result of disciplinary actions in the instant case I was transferred as a result of BOP's failure to comply with the court order, BOP's retaliatory practices and abuse of power. It was held in Allah v. Seiverling, 229 F. 3d 220 (3rd Cir. 2000) that prison officials must NOT use transfer or segregation to restrict one's access to courts.

Thank you for your attention in this matter.

NER

#8 CONTAINS HARASSMENT

NER





**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Detention Center*

*Miami, Florida 33132*

## MEMORANDUM FOR FDC MIAMI INMATE POPULATION

FROM: S. Serrano, Warden

SUBJECT: Addressing Inappropriate Sexual Behavior by Inmates

This memorandum provides notification to all inmates of the Bureau of Prison's zero tolerance of inappropriate sexual behavior towards staff.

- There will be swift action and investigation if sexually inappropriate behavior occurs. Read over and familiarize yourself with the policies and regulations to understand appropriate behavior and boundaries.

- Prosecution will be sought after for inmates who engage in inappropriate sexual behavior.

- Inmates who participates in this type of behavior may be subject to heightened monitoring (e.g. 2 hour watch program).

- Rehabilitative programs aiming to address root causes of this behavior will be provided on a case-by-case basis.

- Educational signs of the zero-tolerance policy will be placed throughout the institution.

Sexual acts or contacts between two or more persons in custody, even when no objections are raised, are prohibited acts, and may be illegal. Sexual acts or contacts between a person in custody and a staff member, even when no objections are raised by either party, are always forbidden and illegal. Persons in custody who have been sexually assaulted by another person in custody or staff member will not be prosecuted or disciplined for reporting the assault. However, persons in custody can be penalized for knowingly filing any false report.

See Admission & Orientation Handbook for further guidance in reporting.

TERYAEVA-REED, JULIA 57914037

#8

*CONTINUED VIOLATION OF CONSTITUTIONAL
RIGHTS & CONTINUED
HARASSMENT W/ NO accountability
part 1*

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------

FROM: Kendall, Gail
TO: 57914037
SUBJECT: KQED news
DATE: 06/20/2024 12:36:06 PM

Biden Administration Seeks to Dismiss Lawsuit Over Bay Area Women's Prison Abuses
Sydney Johnson
Jun 18

The Federal Bureau of Prisons is seeking to dismiss a class action lawsuit demanding systemic changes at a federal East Bay women's prison where eight former officers have been convicted of sexual assault.

Attorneys filed the class action lawsuit last August on behalf of women formerly incarcerated at Federal Correctional Institution, Dublin, who alleged rampant sexual assault and retaliation by officers at the low-security facility. But, BOP abruptly shut down the facility in April, shortly after a federal judge ordered a special master to oversee changes aimed at improving conditions at the prison.

Now that the facility has shuttered, the government is asking a federal judge to dismiss the class action case entirely.

"The injunctive claims addressing conditions of confinement at FCI Dublin a facility where no inmates are confined must be dismissed as moot," the motion filed on Tuesday reads.

In addition to the class action case, FCI Dublin is facing nearly 60 lawsuits around sexual assault, retaliation and medical neglect from allegations dating back to around 2021, when an Associated Press investigation found a culture of abuse and cover-ups that had persisted for years at the low-security federal women's prison, which had more than 650 inmates.

Sponsored

Both the BOP and the court recognized that FCI Dublin was in "dire need of immediate change," the motion reads.

In early April, U.S. District Judge Yvonne Gonzalez Rogers appointed Wendy Still as the first-ever "special master" for the U.S. Bureau of Prisons and ordered her to produce a report on conditions at the facility and facilitate mandatory changes at the prison, including improving sexual assault reporting protocols and access to mental and physical health care.

The Biden administration responded by shutting down the facility and sending hundreds of women previously housed there to prisons across the country, in many cases far away from family and attorneys.

Advocates for women previously incarcerated at FCI Dublin say dismissing the class action lawsuit would ignore the life-threatening patterns of abuse that women at the prison had to endure   and in some cases at the facilities they were moved to.

"If BOP succeeds in its plan to evade court scrutiny, there will be no accountability as they continue to abuse and retaliate against people behind closed doors," Emily Shapiro of the California Coalition for Women Prisoners, an organizational plaintiff in the class action lawsuit, said in an email. "The next person assaulted by one of their guards or punished for coming forward will know that the Biden BOP and Director Colette Peters are responsible."

RELATED COVERAGE
Trial for Class Action Lawsuit Over Troubled Women's Prison Slated for June 2025
Closure of California Federal Prison Was Poorly Planned, Judge Says, Ordering Further Monitoring
Women at Troubled East Bay Prison Forced to Relocate Across the Country
Nearly 60 plaintiffs' individual damages cases are still active. If Dublin is eventually reopened, it will not be used to house women again, according to the government's motion.

Meanwhile, members of Congress are ramping up their inquiries into how the BOP handled closing FCI Dublin and are seeking an explanation from BOP Director Collette Peters on the chaotic situation.

"In the weeks since BOP announced the closure of FCI Dublin on April 15, we have heard   shocking abuses that allegedly took place during the mass AIC transfers," reads a letter sent to Peters on June 13, signed by nearly two dozen Congress members. The letter lists several of the abuses women have alleged took place during the transfer process, including whistleblower retaliation, inhumane treatment, and withholding of medical care. "This level of disregard for human dignity cannot be tolerated."

TRULINCS  57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E
--------------------------------------------------------------------------------

Despite BOP's order to close FCI Dublin, Special Master Wendy Still has continued her assignment and submitted a report to the court about the conditions and culture at the facility based on interviews and various records released to her for the assessment.

That report has not yet been released to the public, and the federal government is simultaneously seeking to keep it private, according to another motion filed on Monday, calling its findings "demonstrably incorrect."

"At every turn, the BOP has tried to silence incarcerated people and avoid public scrutiny. For years, they failed to prevent rampant sexual abuse and allowed survivors to be punished with solitary confinement simply for speaking out," Kendra Drysdale, who was formerly incarcerated at Dublin, said in an email. "These are not the actions of an agency interested in public safety or community accountability. They are not the actions of an agency that takes seriously learning from its mistakes and protecting the people in its custody."

TRULINCS 57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 06/04/2024 02:49:34 PM

To: Ms. Serrano and/or her successor/assigned
Inmate Work Assignment: ILLEGAL TRANSFER NOTICE

***NOTICE TO AGENT IS NOTICE TO PRINCIPAL AND NOTICE TO PRINCIPAL IS NOTICE TO AGENT***

  Ms. Serrano, you are herein NOTICED that my transfer from FCI Dublin to FDC Miami was illegal, in violation of the court order. My continued detention at FDC MIAMI makes prison officials at FDC Miami an "accommodation party" to said illegal transfer. In addition such transfer is in violation of numerous constitutional rights.

  Specifically and particularly, in Castle v. Clymer, 15 F. Supp. 2d 640 (E.D. Pa 1998) the court held that prison officials violated the constitution when they transferred a prisoner in response to letters he had written to a journalist. The court found that because there was no security risk, the transfer was unreasonable. Likewise, I posed no security risk to BOP and the transfer was in retaliation to other inmates at FCI Dublin exercising their First Amendment right.

  The transfer from FCI Dublin to FDC Miami, a pretrial facility that houses mostly male prisoners and comparable to Supermax creates "atypical and significant hardship on prisoner in relation to the ordinary incidents of prison life" under Supreme Court case that established standard of review for Fourteenth Amendment violations, Sandin v. Connor, 515 U.S. 472 (1995). In my case, the transfer resulted in interruption of work and programming, loss of wages and other income, loss of property, loss of social ties, loss of contact with friends due to no video visitation at FDC Miami, loss of ability to practice Buddhist religion, loss of meaningful access to outdoor recreation, access to law library. FDC Miami is comparable to Supermax it that is has excessive lock down times, punitive living conditions (lights are on from 6am to 11pm and not regulated resulting in sleep deprivation, inappropriate mattress sizes comparable to SHU, constant plumbing issues, elevators not working resulting in lockdowns); living conditions at FDC Miami cumulatively constitute "atypical and significant hardship" in relation to the ordinary life.

  In Wilkinson v Austin, 545 U.S. 209 (2005) the court held that transfer to Supermax violated Fourteenth amendment rights. In Aref v. Lynch, 833 F. 3d 242 (D.C. Sir. 2016) the court held that transfer to CMU violated prisoner's constitutional rights. It is important to differentiate that while most transfers to higher security prisons are a result of disciplinary actions in the instant case I was transferred as a result of BOP's failure to comply with the court order, BOP's retaliatory practices and abuse of power. It was held in Allah v. Seiverling, 229 F. 3d 220 (3rd Cir. 2000) that prison officials must NOT use transfer or segregation to restrict one's access to courts.

Thank you for your attention in this matter.

STATEMENT OF LOSS AND DAMAGES

BRIEF STATEMENT OF FACTS:

On or about April 14-18, at approximately 10am I was given one green duffle bag and was told to pack up all my personal property and legal materials due to FCI Dublin's closure and immediate transfer of all inmates. As a result of the transfer I sustained loss of personal property, loss of wages, and loss of other income. In addition to colossal financial losses my work and programming were interrupted that could substantially reduce my time, the processing time for community placement and re-entry paperwork has been delayed, I was unable to timely refile motion for compassionate release and the transfer caused delay in filing motion for time reduction by the public defender. I am seeking compensatory damages in the amount of $20,800.00 and punitive damages due to illegal transfer in the amount of $250,000.00. The transfer was illegal because it violated court order mandating screening all inmates PRIOR to transfer for release to community and transfer to CORRECT BOP facilities, and otherwise. Inmates were also transferred without medical clearance and were placed in facilities where their constitutional rights are continue to be violated.

In Siggers-El v. Barlow, 433 F.Supp. 2d 811 (E.D. Mich. 2000) a prisoner received $200,000.00 in punitive damages and $19,000 in compensatory damagers after he was transferred in retaliation for complaining to the warden that violated his constitutional rights.

ITEMIZED STATEMENT OF LOSS AND DAMAGES:

PERSONAL PROPERTY LOSS EST. ...............................................................$2,000.00
(items opened, items being held by other inmates that could not be collected, items that were no longer sold on commissary and could not be taken (i.e. coolers, scissors, glue, colored paper, etc.); items that had to be used/worn and could not be packed out (shoes, towels, shower bag with all hygiene items, clothes, spare radio, clock, earphones, cups, bowls, etc); items that were not in their original condition and considered "contraband" (e.g. items with identified coloring/wording to prevent stealing is a "contraband" item) ; items in excess of items allowed to transfer ( 2 pairs of shoes, 1 bowl, 1 cup, 3 soaps, 3 books of stamps, etc); all unfinished projects and arts and crafts items that were collected over the years and purchased from various inmates; items that had to be purchased and then thrown away before property arrived (shoes, clothes, hygiene items, towels, etc); items confiscated upon arrival.
LOSS OF WAGES ...............................................................................$3,000.00
(projected 14 months remaining on sentence at $250/average monthly pay at UNICOR where I was employed)
LOSS OF OTHER INCOME....................................................................$2,800.00
(arts and crafts items that were not allowed to be taken, $200/month x 14 months remaining on sentence)
EMOTIONAL DISTRESS.......................................................................$3,000.00
(During transfer I was handcuffed, shackled and had a belly chain for over 52 hours, deprived of sleep, sustained minor injuries; I was subjected to numerous strip searches and cavity searches; I lost contact with my friends and family and social ties that are essential for successful re-entry being so close to release)
LOSS OF RESEARCH MATERIALS AND DRAFTS FOR BOOK .....................................$10,000.00
(legal books, drafts and other research materials were in possession of various inmates that could not be collected with such a short notice and due to institutional lockdown. These were to be used for book I was planning on publishing upon release).

TOTAL COMPENSATORY LOSSES.................................................................$20,800.00

TOTAL PUNITIVE DAMAGES....................................................................$250,000.00

TOTAL AMOUNT OF THE TORT CLAIM............................................................$270,800.00

# Exhibit B

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA COALITION FOR WOMEN
PRISONERS, ET AL.,

        Plaintiffs,

    v.

UNITED STATES OF AMERICA BUREAU OF
PRISONS, ET AL.,

        Defendants.

Case No.: 4:23-cv-4155-YGR

ORDER RE CLOSURE OF FCI DUBLIN &
PRELIMINARY INJUNCTION

Re: Dkt Nos. 251, 256, 258, 262–63

Institutions matter. When successful, they provide the structure needed to promote and implement important policies. When they fail, the collapse not only harms those they were created to serve but also those who operated within them, whether or not they contributed to the demise. The Federal Correctional Institution in Dublin and satellite camp (collectively, "FCI Dublin") are now closed. No adults in custody ("AICs") remain. That said, closure is not synonymous with escape. Given the closure, issues of security no longer predominate. Thus, in this Order, the Court publicly summarizes the events which transpired (including some corrections to lawyers' representations) and outlines the necessary and continued monitoring of the Bureau of Prisons ("BOP").

        \*      \*      \*

Shortly after the Court issued a preliminary injunction to protect the constitutional rights of the AICs housed at FCI Dublin and appointed a Special Master to assist therewith, the BOP announced its decision to shutter FCI Dublin and relocate the population. BOP had advised the Court that it was considering closure, although no certainty existed, and noted that if it occurred, for security reasons, it would have to be conducted quickly.

Although it had as much time as needed to prepare, BOP's operational plan for closure of FCI Dublin was ill-conceived and, like Swiss cheese, full of holes. BOP regional staff worked the prior weekend hastily reviewing AIC case files to recommend placements. Arrangements were also made with the Justice Prisoner and Alien Transportation System ("JPATS") to halt all other

prisoner transportation so that the week could be dedicated to the transfers. Beyond those preparations, BOP ignored other operational issues including the proper movement of the AICs' property and the appropriate communication and messaging to the AICs and staff who were not advised of the closure until the last minute. Further, despite regular and direct email communications with the Court, through counsel, BOP "announced" the closure to the Court by burying it in an administrative filing on Friday, April 12, 2024. Immediately upon actually learning of the closure, the Court intervened to ensure proper attention was paid to the AICs' needs (medical, mental health, or otherwise) and to direct the onward transfer of the AICs, the last of which left on May 1, 2024.

## I.   BACKGROUND

### A. Events Preceding the Closure of FCI Dublin

After an evidentiary hearing, nine-hour personal visit to the facility, and in light of recent events, the Court concluded, on March 15, 2024, that conditions at FCI Dublin required immediate change. (Dkt. No. 222 at 1.) The Court did not come to this conclusion lightly but instead based the decision on careful consideration of the record, which evinced BOP's repeated and intentional disregard of the AICs' constitutional rights. To safeguard the AICs, the Court certified their class, issued a preliminary injunction, and appointed seasoned corrections expert Wendy Still as Special Master to assist the Court. (*See* Dkt. No. 232.)

The Court's order appointing Still was issued on March 26, 2024. On Friday, April 5, 2024, the Court met with BOP Assistant Regional Director, Western Region and FCI Dublin Acting Warden Nancy McKinney,[1] FCI Dublin Acting Executive Assistant and Camp Administrator Greg Chaffee, the Special Master, union representatives for the correctional officers, and counsel to review the plan for assessing with more particularity the problems at FCI Dublin in light of the preliminary injunction order. Special Master Still arrived on site on Monday, April 8, 2024. Importantly, during the week preceding the facility's closure, she began to uncover the extent of FCI Dublin's internal deterioration. Operationally, conditions were

---

[1] On May 6, 2024, the Court learned that McKinney had been replaced as warden by C.D. Nash, who had previously served as Associate Warden.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    worse than BOP officials had led the Court to believe. As noted above, on that Friday, April 12,

2    the BOP filed a notice (in the body of a sealed attachment to an administrative motion) wherein it

3    "informed" the Court of its intention to close the facility over the following week, without

4    specifying when such closure would begin. The BOP's obfuscation is obvious.  Its lack of

5    transparency with the Court resulted in negative consequences.[2]  In fact, BOP Regional Director,

6    Western Region Melissa Rios-Marques refused to advise Special Master Still of the impending

7    closure, which would begin the next day, even when asked directly on Sunday, April 14.

8            B.   Closure of the Facility

9           The BOP began to prepare the AICs for transport to other facilities during the early morning

10   hours of Monday, April 15 and had one bus loaded before the Court actually became aware of the

11   closure. The Special Master who was then on-site communicated myriad concerns regarding, among

12   others, the medical clearance process for the AICs being prepared for transport and the eligibility of

13   such individuals for community placements (*i.e.*, home confinement, halfway homes) or release.

14   Based thereon, the Court ordered all transport of the AICs halted. No AICs were transported from

15   FCI Dublin that first day.  Those who had been moved onto the bus were eventually returned to the

16   facility.  Other buses which had been called to the facility were not loaded.

17           C.   The Closure

18          Over the two-plus weeks that followed, the Court provided operational guidance to the BOP

19   relative to the closure of FCI Dublin and transport of the AICs. This guidance came in three main

20   forms. One, the Special Master and her team worked long hours at the facility to address the AICs'

21   concerns, gather information, and ensure compliance with Court orders. Two, the Court held

22   regular sealed status conferences, sometimes as frequently as every other day, with counsel and

23   Warden McKinney to oversee closure and transport issues as they arose. Three, the Court issued a

24   series of sealed orders providing specific directions to BOP. The Court provides a high level

25   overview of such guidance, and the conditions necessitating it, below.

26

27          ───────────────

28   [2] Given the BOP's operational and security concerns, as well as the privacy interests of the
     AICs, the Court GRANTS the sealing motions at Dkt. Nos. 251, 258, and 263 except to the extent
     this Order relies upon the information sought to be sealed therein.

1        As a preliminary matter, the Court notes that both parties have engaged in posturing, both in

2    public and to the Court. The posturing incompletely captured the facts on the ground, fueled public

3    disinformation, and unnecessarily complicated the operational process. For instance, counsel for the

4    BOP created the impression in a public filing (which was later publicly reported) that FCI Dublin

5    staff abandoned their posts due to the closure of the facility. This representation was devoid of

6    necessary context, such as the fact that BOP brought in outside staff who told the officers that they

7    had been relieved of their tasks, thereby creating confusion not only as to the expectations of them as

8    employees but also as to their job prospects. The chaos was of the BOP's own making. Class counsel,

9    for their part, blindly served as a conduit for AIC complaints without distinguishing between those

10    which were plausibly meritorious and others that lacked any measure of reasonableness. For example,

11    at one point, class counsel claimed certain AICs had been flown from FCI Dublin to a different

12    location only to be flown back; a claim that strains logic and credulity. They also misrepresented the

13    eligibility of non-U.S. person AICs for community placement. That some validation of AIC

14    complaints by class counsel was necessary should have been obvious; indeed, ninety percent of the

15    population suffers from trauma and views events through that lens. The closure was particularly

16    difficult on those who were being transported farther away from families and for staff who were not

17    sure they would keep their jobs. Some of this could have been mitigated had the BOP actually

18    followed a fully conceived operational plan. Nonetheless, the posturing made it harder, not easier, for

19    the Court to collaborate with the parties to address meritorious concerns in real time.

20        To illuminate, the Court summarizes below key operational considerations on which the

21    Court, including through the Special Master, provided guidance and oversight.

22        *i.*   *Inadequate Staffing*

23        A key component of FCI Dublin's dysfunction has been the significant lack of adequate

24    staffing. (*See, e.g.*, Dkt. No. 222 at 8–10.) The facility's staffing levels have consistently remained

25    at critically low levels and impacted virtually every area of the facility. This jeopardized the AICs'

26    health and safety, due process, access to programming,[3] and basic rights.

27

28

---

[3] In addition to the issues explored below, the Court notes that inadequate staffing also limited the programming available to the AICs at FCI Dublin. Such programming is important for at least two reasons. First, it enables the AICs to make productive use of their time in custody.

United States District Court
Northern District of California

**Medical and Mental Health Care.** As set forth in the preliminary injunction order, the AICs at FCI Dublin have long been denied constitutionally adequate medical and mental health care due in large part to lack of sufficient staffing. (*See id.* at 10:12–14 ("During inspection, the Court heard a refrain so consistent from so many [AICs] in different quarters and without prompting to demonstrate its reliability: in response to health concerns, medical staff told them to 'lose weight and drink water.'").)

The full extent of the facility's inadequate medical and mental health care and related staffing issues became clear as the Special Master began to interview officers and review records. As she observed, FCI Dublin has repeatedly failed to follow BOP departmental policy related to completing timely health intakes; sick call access was delayed for extended periods; medical needs, including relative to communicable diseases, went untreated or lacked any follow up; and specialty appointments were not timely scheduled. Relatedly, drug treatment programs were not available for the majority of the population that requested treatment, despite drugs being rampant at the facility. Mental health services were also inadequate. By way of illustration, access to psychiatry services was blocked administratively despite repeated requests from the psychology department itself.

The effect of these shortcomings was felt acutely by the AICs during the 16-day period leading to the closure of the facility. It became clear, for instance, that certain AICs had not been properly cleared by medical providers for transit. To the extent clearances had been obtained, the Court was concerned that they were nothing more than rubber-stamps based solely on cursory reviews of the relevant files. Further, such clearances did not meaningfully engage with the fact that many AICs had waited so long for care that even otherwise routine matters may have become more serious given lack of timely treatment in the first instance.

In light of these deficiencies, including their cumulative impact on AICs' wellness, and to prevent additional deterioration in connection with FCI Dublin's closure, the Court took immediate steps to mitigate the situation. This included requiring that (i) the AICs be medically cleared prior

---

Second, lack of programming makes significant amounts of the facility's population unable to earn credits that could impact their release dates and rehabilitative recovery.

United States District Court
Northern District of California

1    to transfer and provided medications needed during their transit to other facilities, which sometimes

2    takes multiple weeks, and (ii) the BOP attend to the AICs in need of urgent medical consults.  As a

3    result, the BOP flew in additional temporary medical providers, as did the Court. To the extent the

4    Court's medical experts questioned clearances for certain AICs, they met and conferred with the

5    BOP medical staff to reach a mutually-agreeable position with respect to each and every individual.

6        As part of this process, the Court required the BOP medical staff to compile a

7    comprehensive roster of the AICs which flagged with "alerts" certain individuals as needing

8    additional medical and/or mental health follow up. The Court will use this document to monitor the

9    care provided by BOP to these individuals upon arrival at their new facilities.

10       **Administrative Remedies & Casework.** The administrative remedy process at FCI Dublin

11   was also effectively non-functional, again due in large part to inadequate staffing. Legitimate issues

12   and complaints raised by the AICs routinely went unaddressed for months, if not years.  For public

13   transparency, the effect of this administrative debacle meant some AICs were not released to

14   community placements like half-way houses or home confinement on time. The Court ordered BOP

15   to conduct casework reviews for every AIC *before* transferring them in order to ensure that the

16   AICs were properly classified and their casework not subjected to additional administrative delays

17   in connection with their transfer to new facilities.

18       The administrative deficiencies were particularly egregious in the context of the AICs'

19   requests for compassionate release, a responsibility of the facility's warden.[4] The Special Master,

20   based on extensive interviews and review of documents, determined that FCI Dublin's processing

21   of such requests was woefully inadequate. Many requests were lost (despite having been properly

22   submitted) or not tracked, let alone adjudicated.[5] To rectify this, the Special Master and Warden

23   McKinney are reviewing all identified requests and processing them, which is nearly complete.

24   _____

25       [4] Such applications are submitted to the warden in the first instance and may only be
     submitted to an AIC's sentencing judge (i) if the BOP agrees to grant compassionate release; (ii)
26   the AIC contests a denial by the BOP; or (iii) the BOP fails to timely act on the request. *See* 18
     U.S.C. 3582(c)(1)(A).
27

28       [5] There is no evidence that such requests were shredded. The issue was administrative.

United States District Court
Northern District of California

1    Thus, the AICs waiting for responses should have them already or have them soon. As a result, a

2    few AICs were released to community placements.

3        As of May 3, 2024, the Court has received 21 requests for compassionate release submitted

4    directly. (*See* Dkt. Nos. 267–74; 276–86; 290; 296.) These requests are procedurally improper and

5    are **DENIED WITHOUT PREJUDICE** on the grounds that this Court was not the sentencing judge for

6    any of the applicants and, thus, has no authority to rule on them. The AICs may resubmit their

7    completed requests to the appropriate judge. A supplemental order is issued herewith addressing

8    this topic and providing guidance to the AICs.

9        Outside of the compassionate release context, the Special Master also determined that FCI

10   Dublin's casework systems were not current. As noted above, irregularities in existing AIC

11   casework impacted AIC time credits and eligibility for community placement or release, among

12   others. The Court intervened to ensure AIC casework was appropriately updated prior to transfer by

13   requiring a casework review for each individual. The results have been positive. For example,

14   Warden McKinney, in consultation with the Special Master, agreed to advance certain release dates

15   scheduled through the end of May 2024 by several weeks based, at least in part, on the casework

16   review process undertaken. This is an example of the sensible and collaborative partnership

17   demonstrated by certain figures in BOP leadership who have, jointly with the Court and Special

18   Master, sought to rectify past harms at FCI Dublin by timely and responsibly addressing the AICs'

19   concerns during closure of the facility.

20        ii.    *Transportation-Related Concerns*

21        Next, the Court became aware of transportation issues regarding the movement of the ACIs

22   to new facilities. Class counsel raised two main categories of concerns, those relative to (i) injuries

23   purportedly sustained during transit, and (ii) destruction of AIC property.[6] The Court addresses

24   each.

25
           [6] Class counsel also alleged that the buses lacked sufficient feminine hygiene products,
26   toilet paper/bathroom facilities, food, and heat, with one particularly egregious case for an AIC on
     her monthly cycle. Unfortunately, there was no video to confirm the allegations. Thereafter, the
27   Special Master and Warden arranged for video surveillance cameras, with audio enabled, to be
     deployed on the remaining buses. The Special Master (or members of her team) and the Warden
28   also boarded the remaining buses to independently confirm sufficient supplies had been loaded and

**Injuries Sustained During Transit**. Class counsel have relayed myriad complaints from various class members concerning the conditions of their transports. Among those are complaints that individual AICs sustained injuries during transit. The Court responded by ordering the identification of such AICs, cataloguing of their complaints, immediate medical examinations upon arrival at new facilities, as well as photographic documentation of any injuries. The BOP has since produced to the Court, Special Master, and plaintiffs' counsel a range of records and photographs for most of those AICs.

While such efforts are ongoing, the Court's preliminary review of the documentation provided suggests any alleged injuries were superficial and caused by overly tight restraints. The Court has reviewed the photographs and has seen no evidence of cuts, welts, or significant bruising. It is not surprising that sitting several hours with restraints would be uncomfortable and lead to soreness, but security protocols cannot be avoided and the complaints appear exaggerated. Class counsel will be provided with those pictures and are ordered to transmit the same to any attorney who may represent an AIC individually for review of the AIC, if appropriate, by their own physicians.

**Destruction of AIC Property**. Given BOP's lack of forethought, it is not surprising that the Court received credible allegations from some of the AICs that, in the process of being moved, they were required to leave behind certain of their personal property, which was then taken by others. The early sets of AICs were provided *only one duffle* bag to pack all of their items, or one duffle bag was packed for them by BOP staff. Some individuals were forced to leave the facility before receiving commissary items they had already purchased.

After the Court raised these issues, the BOP began providing, as of April 18, 2024, the AICs with three boxes per person in which to pack their belongings, the rest of which would be abandoned. Two of the boxes would be shipped to the AIC's final destination. One box would be shipped to the AIC's home address. The BOP agreed to pay for all shipping costs. This is an example of an obvious operational issue which the BOP should have anticipated and rolled out with precision. The BOP

---

to ensure the transports had sufficient heat and blankets accessible. As to the latter point, the response from the AICs were that the buses were too warm.

1   either did, and ignored its obligations, or did not in the first instance. In either event, the result was

2   the same and the responsibility for the operational failure lies with the BOP.

3        The Court takes matters of AIC property seriously, especially where, as here, funds to

4   replenish lost items are limited and the closure occurred through no fault of the AICs. The Court

5   ordered the BOP to distribute claim forms to class members for lost and/or destroyed property.[7] The

6   Court is awaiting a response from the BOP regarding making whole those AICs who paid for, but did

7   not receive, commissary items. Monitoring for compliance and follow-up will continue.

8             *iii.*    *Immigration-Related Concerns*

9        In addition, the Court notes that class counsel have raised concerns relative to the eligibility

10  of certain AICs who are not legally in the United States for community placement. The Court will

11  not go into detail due to the sensitivities involved. However, the Court notes, for transparency

12  purposes, that such concerns are being tracked by the Special Mater, actively addressed with

13  counsel for the BOP, and that any individuals found eligible for such programs are being identified

14  and their cases addressed in the normal course. Most of the cases raised by counsel appear to lack

15  meritorious claims. However, as previously mentioned, the Special Master is still in the process of

16  ensuring all casework documents are appropriately processed, which may change this analysis.

17  Monitoring for compliance and follow-up will continue.

18            *iv.*    *Concerns Regarding Disciplinary Records*

19       Lastly, the Court was recently informed by the Special Master that FCI Dublin's

20  disciplinary records have been the subject of gross neglect by leadership. Warden McKinney

21  referred the Special Master to the Western Regional Hearings Administrator to examine this issue

22  further. The Administrator and Special Master pulled a sample of ten incidents from the period

23  ranging from April 25, 2022 to April 23, 2024. Each were reviewed. The Administrator consulted

24  with additional BOP leadership and determined that each incident record was riddled with errors,

25

26         [7] The Court was recently informed by the Special Master that FCI Dublin staff may have
27  written on various claims forms that the AICs left certain of their remaining items at the facility
    unsecured when they were transferred. If true, this represents an affirmative attempt by staff to flout
28  the administrative process by which the AICs incarcerated at BOP facilities are able to seek redress
    for lost property. The Special Master's assessment of this alleged practice is ongoing.

United States District Court
Northern District of California

including due process issues. For instance, the AICs had not been notified of the disciplinary charge for which they were found guilty, sanctions were incommensurate with the infractions charged and were inconsistently applied, and timeliness issues abounded. Following this review, *all ten incidents* were expunged from the AICs' records based on the determination of the Administrator.

Resolution of this issue must occur promptly. The AIC's are entitled to due process for disciplinary infractions. The outcomes of disciplinary reviews such as these impact the AICs' classification designations. Such designations may have meaningful impacts on the eligibility of the AICs for community placement or release. Given each incident randomly selected merited expungement, the Court has no confidence that the disciplinary infractions of class members were appropriately processed. A comprehensive audit is therefore necessary to ensure the AICs were transferred to the right facilities and eligibility determinations with respect to community placements or release were accurate in the first instance or are revised and acted upon. Monitoring for compliance and follow up relative to the audit is required.

## II.    CONTINUED MONITORING OF CLASS MEMBER WELFARE

As set forth at length above, the conditions at FCI Dublin prior to its closure were constitutionally suspect. While closure certainly obviates the need, at least for now, to address certain concerns identified in the Court's prior order, other issues may persist, until proven otherwise. The cumulative impact of FCI Dublin's insufficient staffing and related medical and mental health care inadequacies is still being felt by the AICs in need of treatment, not to mention the property and audit issues. Continued monitoring of class members' welfare is therefore warranted until BOP provides the Court with sufficient proof that the issues can be, and are being, addressed.

As such, the Court hereby **ORDERS** the BOP to take measures to identify, track, and respond to AICs' concerns as outlined below. A full list of the actions required to be taken is included in Section V of this Order.

### A. Staffing Concerns

Ensuring that transferee institutions have sufficient staffing to address the needs of the AICs previously incarcerated at FCI Dublin is paramount. Accordingly, the Court requires the BOP to

United States District Court
Northern District of California

1    provide a staffing report on each transferee institution[8] with details on the number of budgeted,

2    authorized positions and associated vacancies, broken down by department. The staffing report

3    shall be provided in the first instance for the period since January 1, 2024 and shall be updated

4    through the trial on this action unless otherwise ordered.  Such monthly reports shall also address

5    staffing augmentations.

6         B.  Medical and Mental Health Alerts

7         Assuming adequate staffing is in place, the Court expects transferee institutions to timely

8    address the class member medical and mental health concerns already communicated (*e.g.*, those

9    called out through "alerts" placed by the Special Master). To assist the Court in ensuring

10   compliance with such directives, the BOP shall submit weekly reports updating the aforementioned

11   ACI roster. These updates shall address actions taken to address alerts and, when the BOP believes

12   compliance is complete, requests to the Special Master to terminate them. No alerts will be

13   removed until the Court and Special Master are satisfied that the required action has been taken.

14   Updates shall continue until the trial on this action unless otherwise ordered.

15        C.  Additional Items Requiring Ongoing Monitoring

16        Finally, the Court addresses a limited number of additional items. First, the BOP shall

17   include with the above-referenced roster updates descriptions of actions taken to resolve the AICs'

18   concerns relative to transportation-related concerns, including lost property. Second, the BOP shall

19   facilitate the Special Master's continued access to necessary information and technology, as well as

20   that of designated members of her team. Third, the BOP shall ensure class members do not lose

21   time credits for time spent in transit to their new facilities given that the closure was solely the

22   result of the BOP's own deficiencies. Fourth, the BOP shall update the AIC roster to track any

23   Prison Rape Elimination Act ("PREA") claims previously made by class members and any claims

24

25

26        [8] The Court understands FCI Dublin AICs have been transferred to the following BOP
27   facilities: Aliceville FCI, Carswell Federal Medical Center, Hazelton FCI, Miami Federal Detention
     Center ("FDC"), Pekin FCI, Philadelphia FDC, SeaTac FDC, Tallahassee FCI, Victorville Medium
28   I FCI, and Waseca FCI.

11

1    of retaliation such class members make arising out of having filed such claims,[9] retaliation

2    complaints filed by class members of which they are aware, and to identify to whom they have

3    been referred. Updates shall continue until the trial on this action unless otherwise ordered.

4    **III.    OUTSTANDING MOTIONS**

5         Having addressed the conditions at FCI Dublin preceding its closure as well as the Court's

6    plans for continued monitoring of the ACIs' welfare, the Court turns next to two outstanding

7    motions from the parties, only one of which requires analysis at this stage.[10]

8         On April 16, 2024, the BOP filed a Rule 60 motion for relief from the Court's emergency

9    orders. The BOP characterized the Court's orders as imposing "a de facto requirement that [it] keep

10   FCI Dublin open [after April 19, 2024] and keep inmates at that facility despite the various

11   shortcomings and limitations the Court has previously identified." (Dkt. No. 257 at 15:4–6.)  The

12   BOP argued this implicit directive exceeded the Court's authority and requested, as relief, that the

13   Court permit the BOP to "continue with its process of safely transferring out all AICs, while

14   including the Special Master in all requested information." (*Id.* at 15:9–10.)

15        As previously communicated to the BOP, the motion is **DENIED**. Three considerations drive

16   this analysis. *One*, the steps taken by the Court relative to the closure of FCI Dublin were explicitly

17   contemplated by its prior preliminary injunction order. As set forth therein, the Court put the BOP

18   on notice that it anticipated issuing additional orders "so that the constitutional rights of those

19   imprisoned at [FCI Dublin] are no longer at significant risk." (Dkt. No. 222 at 1:20–21.)

20

21

---

22        [9] The Special Master informs the Court that, as with many other administrative deficiencies
     at the facility, FCI Dublin did not appropriately track and process PREA claims filed by its AIC
23   population. Thus, the Special Master anticipates identifying to the BOP additional individuals who,
     through no fault of their own, have not previously been tracked as having PREA claims.
24

25        [10] In addition to the government's motion for relief, which is addressed below, plaintiffs
     filed a request for a temporary restraining order seeking to enjoin transfer of the FCI Dublin AICs
26   to other facilities. *See* Dkt. No. 262. Shortly after the filing was received, the Court orally informed
     plaintiffs that any attempt to prevent closure of the facility was denied as the determination to
27   shutter FCI Dublin was within the BOP's discretion. Thus, the entire motion is **TERMINATED AS
     MOOT**. Any specific issues which plaintiffs believe are not mooted must be reasserted given the
28   changed circumstances.

United States District Court
Northern District of California

1    *Two*, the Court's guidance to the BOP regarding closure of the facility represents a logical

2    extension of the commands of preliminary injunction order. Indeed, the Court's sealed orders

3    concerned similar topics, including medical and mental health care and administrative remedies,

4    which the BOP had effectively ignored in its operational plans for the closure.

5    *Three*, the Court did not and could not order the BOP to abandon its decision to close the

6    facility, nor did the Court require that the facility remain open until a specific date. Instead, the

7    Court's guidance required the BOP to provide constitutionally adequate care and processes to FCI

8    Dublin's AICs.

9    It strains credulity for the BOP to assert that the Court's guidance to the BOP was unlinked

10   to any source of legitimate authority. Context is important. The Court determined the ACIs at FCI

11   Dublin were not receiving constitutionally required care and took steps to address such

12   deficiencies, such as entering a preliminary injunction. Once closure was announced, the Court

13   took steps to adapt the preliminary injunction to changing circumstances. Further, the BOP cannot

14   hide from or escape its obligations by merely closing FCI Dublin.  The class members have been

15   denied medical and mental health treatment for years in some cases, and months in others.  The

16   Court will not tolerate continued delay.

17   **IV.    NEXT STEPS**

18   The BOP has represented to the Court that they intend to try this case. Thus, the Court **SETS**

19   a case management conference on **Thursday, May 16, 2024 at 9:00 a.m.** to address pretrial

20   scheduling as well as any questions the parties may have after reviewing this Order. The case

21   management conference will be held via Zoom and accessible to the public.[11] The parties shall

22   follow all local rules with respect to the filing of case management statements.  As orally advised,

23   the Court can currently accommodate a trial in the Fall/Winter of 2024.[12]

24

---

25   [11] The case management conference will be accessible via the public hearings link posted on
     the Court's public webpage: https://www.cand.uscourts.gov/judges/gonzalez-rogers-yvonne-ygr/.
26

27   [12] For clarity, the Court notes that this litigation is currently separate from sixty-plus other
     cases which concerns exclusively claims arising out of FCI Dublin staff sex abuse. Those
28   proceedings are stayed until the summer 2024 and may be extended to facilitate ongoing settlement
     discussions.

United States District Court
Northern District of California

## V.   CONCLUSION

The BOP's closure of FCI Dublin, especially coming so soon after issuance of this Court's preliminary injunction, created serious concerns relative to the AICs' welfare, some of which persist. The Court has taken, and continues to take, active steps to address these concerns, including by implementing compliance systems to hold the BOP accountable to providing class members constitutionally adequate care, no matter their current locations.

To that end and in summary, the BOP is hereby **ORDERED** as follows. The below directives may be adjusted in the months to come.

1. The BOP shall provide a monthly staffing report to the Court and Special Master for each BOP facility to which FCI Dublin class members were transferred.

   a. The staffing report shall include the number of budgeted, authorized positions and associated vacancies detailed by correctional, casework, program, mental health, and medical classifications.

   b. The first report shall include staffing and vacancies as of January 1, 2024.

   c. The staffing report shall also include staffing augmentations for such facilities.

2. The BOP shall maintain and provide a weekly update to the tracking roster created for the class members housed at FCI Dublin. Columns and associated information will be updated to reflect any changes occurring during the reporting period. The roster shall be distributed to the Court, Special Master, and class counsel.

3. The BOP's updates shall include details regarding alerts, such as alerts addressed and any proposed alerts to be removed from the roster. The Special Master's approval is required prior to the removal of an alert. Any proposed removal of alerts shall include what the alert required (*i.e.*, medical follow- up, mental health) and the action taken in response.

4. The BOP's roster updates will also include information related to the existence of property and transportation related claims/issues as well as their resolution.

5. The Special Master and designated team members will continue to have access to information relative to this litigation, and they will be provided with BOP laptops and PIV cards to access that information. They will only access information related to class members and information needed for reporting to the Court.

6. The BOP shall ensure no credit loss occurs for class members due to the transfer from FCI Dublin to other BOP facilities. The BOP shall confirm the same in a written declaration.

7. The BOP's weekly reports shall inform the Court, Special Master, and class counsel of any updates relative to PREA claims made by class members concerning conduct at FCI Dublin, including with respect to any claims of retaliation made by such AICs.

8. The BOP Western Regional Disciplinary Hearing Administrator shall audit FCI Dublin's Unit Disciplinary Actions and Disciplinary Hearing Officer's actions between April 25,

1   2022 and May 1, 2024. Necessary corrective actions shall be taken on incidents and
    associated disciplinary actions where due process and other errors occurred. To the extent
2   such issues are identified, they shall be tracked via the above-mentioned roster.

3
4       Given the utter failure of FCI Dublin to address fundamental operational requirements, the

5   Court's  monitoring and compliance outlined herein is necessary, unfortunately.  Given Warden

6   McKinney's collaboration, the Court has a measure of hope that the outstanding issues can be

7   addressed promptly, allowing the Court to retract from the need to oversight, although she has now

8   been replaced.  The BOP serves an important purpose.  The Director's challenge is to find more

9   people like Warden McKinney to implement those goals and weed out, or retrain, others who have

10  contributed to the reputational decline of the BOP.  In the meantime, the Court will continue to

11  provide oversight to safeguard class members from adverse actions connected to the events that

12  transpired at FCI Dublin.

13                              *          *          *

14      To ensure transparency, the Court **ORDERS** that the BOP provide a copy of this Order to

15  each member of the certified class via the Trust Fund Limited Inmate Computer System

16  ("TRULINCS") within no more than **three (3) business days**. Class members are reminded that the

17  Court has appointed class counsel to represent their interests in this litigation. Their contact

18  information is appended hereto as Attachment A.

19      This terminates Dkt. Nos. 251, 256, 258, 262–63.

20      IT IS SO ORDERED.

21

22  Date: May 8, 2024

23                                              YVONNE GONZALEZ ROGERS
                                                UNITED STATES DISTRICT COURT JUDGE
24

25

26

27

28

                                       15

Case 4:24-cv-03910-JSW   Document 1-1   Filed 06/28/24   Page 37 of 49
5/8/24, 2:23 PM     Case 4:23-cv-04155-YGR   Document 300-1 - Filed 05/08/24   Page 1 of 3
Release of Transcript Restrict     07/15/2024
(255)

**Plaintiff**

**California Coalition for Women
Prisoners**

represented by **Adrienne Spiegel**
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street
Sixth Floor
San Francisco, CA 94105
415-433-6830
Email: aspiegel@rbgg.com
*ATTORNEY TO BE NOTICED*

**Amaris Montes**
Rights Behind Bars
District of Columbia
416 Florida Avenue NW, #26152
Washington, DC 20001
202-455-4399
Email: amaris@rightsbehindbars.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Carson Dean Anderson**
Arnold and Porter Kaye Scholer LLP
5 Palo Alto Square, Suite 500
3000 El Camino Real
Palo Alto, CA 94306
(650) 319-4500
Fax: (650) 319-4700
Email: carson.anderson@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**D. Dangaran**
Rights Behind Bars
416 Florida Avenue NW #26152
Washington, DC 20001
202-540-0029
Email: d@rightsbehindbars.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ernest James Galvan**
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105-1738
(415) 433-6830
Fax: (415) 433-7104
Email: egalvan@rbgg.com
*ATTORNEY TO BE NOTICED*

**Ginger Jackson-Gleich**
Rosen Bien Galvan & Grunfeld LLP
101 Mission St., Sixth Floor

San Francisco, CA 94105
415-433-6830
Email: gjackson-gleich@rbgg.com
*ATTORNEY TO BE NOTICED*

**Luma Khabbaz**
Rosen Bien Galvan & Grunfeld LLP
CA
101 Mission Street, Sixth Floor
6th Floor
San Francisco
San Francisco, CA 94105
415-433-6830
Email: lkhabbaz@rbgg.com
*ATTORNEY TO BE NOTICED*

**Natalie Steiert**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington D.C., DC 20001-3743
202-942-6716
Email: natalie.steiert@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Oren Nimni**
Rights Behind Bars
416 Florida Avenue NW
Ste #26152
Washington, DC 20001
202-540-0029
Email: oren@rightsbehindbars.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen Seungkun Cha-Kim**
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-7270
Email: stephen.cha-kim@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Susan M. Beaty**
California Collaborative for Immigrant
Justice
1999 Harrison St. Suite 1800
Oakland, CA 94612
510-679-3674
Fax: 415-840-0046
Email: susan@ccijustice.org
*ATTORNEY TO BE NOTICED*

**Kara Jane Janssen**

Rosen Bien Galvan & Grunfeld
101 Mission Street
Sixth Floor
San Francisco, CA 94105-1738
United Sta
(415) 433-6830
Fax: (415) 433-7104
Email: KJanssen@rbgg.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**R. B.**                    represented by  **Adrienne Spiegel**
                             (See above for address)
                             *ATTORNEY TO BE NOTICED*

*D. Ct. for the Northern Dist. of CA*
*450 Golden Gate Ave*
*San Fr. CA 94102*

                             **Amaris Montes**
                             (See above for address)
                             *PRO HAC VICE*
                             *ATTORNEY TO BE NOTICED*

                             **Carson Dean Anderson**
                             (See above for address)
                             *ATTORNEY TO BE NOTICED*

                             **D. Dangaran**
                             (See above for address)
                             *PRO HAC VICE*
                             *ATTORNEY TO BE NOTICED*

                             **Ernest James Galvan**
                             (See above for address)
                             *ATTORNEY TO BE NOTICED*

                             **Ginger Jackson-Gleich**
                             (See above for address)
                             *ATTORNEY TO BE NOTICED*

                             **Luma Khabbaz**
                             (See above for address)
                             *ATTORNEY TO BE NOTICED*

                             **Natalie Steiert**
                             (See above for address)
                             *PRO HAC VICE*
                             *ATTORNEY TO BE NOTICED*

                             **Oren Nimni**
                             (See above for address)
                             *PRO HAC VICE*
                             *ATTORNEY TO BE NOTICED*

                             **Stephen Seungkun Cha-Kim**
                             (See above for address)
                             *ATTORNEY TO BE NOTICED*

# Exhibit C

*EXHAUSTION - Denied/*
*Not available at FDC Miami*

TRULINCS  57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

---------------------------------------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 06/04/2024 02:58:15 PM

To: Ms. Serrano and/or her successor/assigned
Inmate Work Assignment: ADMIN REMEDY FORMS REQUES

Ms. Serrano,
Can you please make sure that BP-9, BP-10, BP-11 forms are available for the required exhaustion of Administrative Remedy
at BOP level and do not cause unnecessary delay in order to file with court? Thank you.
-----TERYAEVA-REED, JULIA on 6/4/2024 2:56 PM wrote:

>

Ms. Jones,
   On or about 5/27/24 I gave you several Informal Resolution Requests that were returned without resolution or response. If
there is no response, the request can be legally considered "denied". I would like to proceed to the next level appeal and ask
you to provide me with seven BP-9 forms to the Warden (blue color). You previously informed me that these forms were not
available and then told me I still needed to do cop-out requests and I have given you all electronic cop-out that were submitted
and delivered electronically to the intended recipients. Again, because there is no resolution or response, I would like to
proceed to the next level appeal and I need seven BP-9 forms so I can exhaust my administrative remedy requirement. Thank
you.

*Exhaustion - Denied/ NOT available at FDC Miami*

TRULINCS  57914037 - TERYAEVA-REED, JULIA - Unit: MIM-A-E

--------------------------------------------------------------------------------

FROM: 57914037
TO: Warden
SUBJECT: ***Request to Staff*** TERYAEVA-REED, JULIA, Reg# 57914037, MIM-A-E
DATE: 06/11/2024 06:41:47 PM

To: Ms. Serrano, Warden and/or her successor/assigned
Inmate Work Assignment: admin remedy issue

Ms. Serrano, I previously e-mailed you on 6/4/2024 in reference to consistent denial of Administrative Remedy Forms, BP-9, BP-10, BP-11. I have not received any response from you. Can you please address this? Please, see below.
-----TERYAEVA-REED, JULIA on 6/11/2024 6:39 PM wrote:

>

On Monday, 6/9/2024 I turned in the same 8.5 forms to Ms. Jones and Ms. Payne during the open house that were once again returned to me. I was told I needed to submit cop-out requests first and attach them. The cop-out requests that I submitted were not returned to me. I also submitted electronic cop-out requests that were delivered to intended recipients without any resolution. According to BOP Program Statement PS 1330.18 "Administrative Remedy Program" no cop-outs or electronic cop-outs are necessary to initiate Administrative Remedy Program. In fact, the program statement does not even mention 8.5 forms that unit team requires.
  I am asking to provide me with total of 8 forms (#9-Warden and #10 Regional Director-SENSIVE) so I can start my administrative remedy and exhaust my administrative remedies at the BOP level. I have been going back and forth with the same 8.5 forms since 4/30/2024 and have been denied Administrative Remedy Forms #9-Warden, #10-Regional Director, #11-Central Office. Can you please review program statement and provide the forms to be in accordance to YOUR POLICY? Thank you.
-----TERYAEVA-REED, JULIA on 6/4/2024 2:58 PM wrote:

>

Ms. Serrano,
Can you please make sure that BP-9, BP-10, BP-11 forms are available for the required exhaustion of Administrative Remedy at BOP level and do not cause unnecessary delay in order to file with court? Thank you.
-----TERYAEVA-REED, JULIA on 6/4/2024 2:56 PM wrote:

>

Ms. Jones,
  On or about 5/27/24 I gave you several Informal Resolution Requests that were returned without resolution or response. If there is no response, the request can be legally considered "denied". I would like to proceed to the next level appeal and ask you to provide me with seven BP-9 forms to the Warden (blue color). You previously informed me that these forms were not available and then told me I still needed to do cop-out requests and I have given you all electronic cop-out that were submitted and delivered electronically to the intended recipients. Again, because there is no resolution or response, I would like to proceed to the next level appeal and I need seven BP-9 forms so I can exhaust my administrative remedy requirement. Thank you.

*Law Library* #1



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*Federal Detention Center*
*Miami, Florida  33132*

Date: 5/27/24          **INFORMAL RESOLUTION**

Inmate Name: Julia Teryaeva-Reed Reg. No. 57914-037 Unit: 5AE

**NOTICE**: You are advised that prior to filing a Request for Administrative Remedy (BP-9), you **MUST** attempt to informally resolve your complaint through your counselor. Please follow the three (3) steps listed below.

1.    State your specific complaint: I am Requesting meaningful access to law library, access to copier/printer/typewriter and space to prepare legal documents due to open class action, need to Refile my compassionate Release, case for FSA time credit application, motion for sentence Reduction for First time offenders, immigration detainer Removal Research/doc. preparation and other legal documents.

2.    State what efforts you have made to resolve your complaint: I sent electronic cop-outs to the Warden, Ms. Serrano; Captain, Mr. Taylor, associate warden, R. Morris on 4/30/24 and follow up to warden ..

3.    State what resolution you request: to provide meaningful access to law library during all out-of-cell hours like in other BOP prisons

Inmate Signature: *[signature] Without Prejudice / All Rights Reserved* Date: 5/27/24

Correctional Counselor's Comments: _____

_____

_____

_____

_____

Correctional Counselor Signature: _____ Date: _____

Unit Manager's Comments: _____

_____

_____

Unit Manager's Signature: _____ Date: _____

OUTDOOR REC   #2



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*Federal Detention Center*
*Miami, Florida  33132*

Date: _5/27/24_   **INFORMAL RESOLUTION**

Inmate Name: _Julia Teryaeva-REED_ Reg. No. _57914-037_ Unit: _5AE_

**NOTICE**: You are advised that prior to filing a Request for Administrative Remedy (BP-9), you **MUST** attempt to informally resolve your complaint through your counselor. Please follow the three (3) steps listed below.

1.   State your specific complaint: _I am asking to provide_
_meaningful access to outdoor Recreation_
_during all out-of-cell hours like in other_
_BOP prisons_

2.   State what efforts you have made to resolve your complaint: _I sent electronic_
_notice/cop-out to the Warden, Ms. Serrano, Captain, Mr._
_Taylor, AW R. Morris  on 4/30/24 and follow up to Warden_
3.   State what resolution you request:
_to provide meaningful access to outdoor Recreation_

Inmate Signature: _Without Prejudice, All Rights Reserved_   Date: _5/27/24_

Correctional Counselor's Comments: _____

_____

_____

_____

_____

Correctional Counselor Signature: _____ Date: _____

Unit Manager's Comments: _____

_____

_____

Unit Manager's Signature: _____ Date: _____

Religious Services #3



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*Federal Detention Center*
*Miami, Florida  33132*

Date: __5/27/2024__        <u>**INFORMAL RESOLUTION**</u>

Inmate Name: __JuliA TeryaevA-Reed__  Reg. No. __57914-037__  Unit: __5AE__

<u>**NOTICE**</u>:  You are advised that prior to filing a Request for Administrative Remedy (BP-9), you **MUST** attempt to informally resolve your complaint through your counselor.  Please follow the three (3) steps listed below.

1.     State your specific complaint: I am Requesting to attend and practice Buddhist Religious services, to do daily meditations and to meet with a "spiritual leader". Buddhist services are available to men but not women in FDC Miami and other women can go to Catholic & Christian church/services/mass. It is my right under 1st, 14th Amendments, protected by the Religious Freedom Restoration Act (RFRA) and RPLUPA - see electronic cop-out 5/18/24.

2.     State what efforts you have made to resolve your complaint: I have sent several electronic cop-outs to the Chaplain/Religious services and to the warden, Ms. Serrano and/or her successor/ assigned

3.     State what resolution you request: I am Requesting to be able to attend Buddhist Religious services, to do daily meditation in church, and to meet with spiritual leader

Inmate Signature: /Without Prejudice       Date: 5/27/24
/All Rights Reserved

Correctional Counselor's Comments: _____

_____

_____

_____

_____

Correctional Counselor Signature:_____ Date:_____

Unit Manager's Comments:_____

_____

_____

Unit Manager's Signature:_____ Date:_____

#4

VIDEO VISITS

U.S. Department of Justice
Federal Bureau of Prisons
*Federal Detention Center*
*Miami, Florida 33132*

## INFORMAL RESOLUTION

Date: 5/27/24

Inmate Name: Julia Teryaeva-Reed Reg. No. 57914037 Unit: 5AE

NOTICE: You are advised that prior to filing a Request for Administrative Remedy (BP-9), you **MUST** attempt to informally resolve your complaint through your counselor. Please follow the three (3) steps listed below.

1. State your specific complaint: I am Requesting free and unlimited VIDEO VISITATION privileges, as provided under the CARES ACT, and 2-ful day in person visitation - like all other BOP prisons.

2. State what efforts you have made to resolve your complaint: I have sent electronic cop-outs addressing these issues on 4/30/24 to Warden, Ms. Serrano, Capt. Mr Taylor, AW R. Morris, and on 5/24/24 to Warden again.

3. State what resolution you request: to have free and unlimited video visitation privileges and 2-full-day in person visits

Inmate Signature: [signature] Without Prejudice All Rights Reserved Date: 5/27/24

Correctional Counselor's Comments: ____

Correctional Counselor Signature: ____ Date: ____

Unit Manager's Comments: ____

Unit Manager's Signature: ____ Date: ____

WORK & PROGRAMMING     #5



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*Federal Detention Center*
*Miami, Florida  33132*

Date: 5/27/2024     **INFORMAL RESOLUTION**

Inmate Name: Julia Teryaeva-Reed  Reg. No. 57914037   Unit: 5AE

NOTICE: You are advised that prior to filing a Request for Administrative Remedy (BP-9), you MUST attempt to informally resolve your complaint through your counselor. Please follow the three (3) steps listed below.

1.   State your specific complaint: I am Requesting to provide meaning-
ful work & programming opportunities as mandated by the
FSA, codified in Title 18 USC §3632, 3621, BOP P.S. 5220.01
that "every prisoner" should be given "the opportunity to parti-
cipate in and complete the type and amount of evidence-based
Recidivism Reduction programs or productive activities..."

2.   State what efforts you have made to resolve your complaint: I sent electronic cop-out
to Warden Serrano, Capt. Taylor, AW R. Morris; and on 5/3/24
I sent another electronic cop-out to Warden, Ms. Serrano.

3.   State what resolution you request: I request a job equivalent to UNICOR call center in FCI
Dublin with an average wages of $200-300/month and
FSA credit hours.

Inmate Signature: Without Prejudice   Date: 5/27/24
All Rights Reserved

Correctional Counselor's Comments: _____
_____
_____
_____
_____

Correctional Counselor Signature: _____ Date: _____

Unit Manager's Comments: _____
_____
_____

Unit Manager's Signature: _____ Date: _____

EXCESSIVE LOCKDOWNS #6



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*Federal Detention Center*
*Miami, Florida 33132*

Date: 5/27/2024          **INFORMAL RESOLUTION**

Inmate Name: Julia Teryaeva-Reef Reg. No. 57914 037 Unit: 5AE

**NOTICE:** You are advised that prior to filing a Request for Administrative Remedy (BP-9), you **MUST** attempt to informally resolve your complaint through your counselor. Please follow the three (3) steps listed below.

1.    State your specific complaint: I am asking to discontinue excessive lockdown policy - 2 times for census counts and 3 times for meals tier by tier, totaling 6 hours excessive lockdown & to allow inmates to use phone, computers and showers during mainline like in all other BOP prisons. Excessive lockdown also interfere with my right to access courts

2.    State what efforts you have made to resolve your complaint: I have sent electronic cop out to Warden, Ms Serrano; Capt. Mr Taylor, AW R.Morris on 4/30/24 and 5/25/24 to Warden Serrano.

3.    State what resolution you request: I am asking to discontinue excessive lockdowns for census and 3 times for Mainline every day & to allow inmates to use phone, computer and showers during mainline

Inmate Signature: Without Prejudice,          Date: 5/27/24
                  All Rights Reserved

Correctional Counselor's Comments: _____
_____
_____
_____
_____

Correctional Counselor Signature:_____ Date:_____

Unit Manager's Comments:_____
_____
_____

Unit Manager's Signature:_____ Date:_____

LIVING CONDITIONS #7



**U.S. Department of Justice**
**Federal Bureau of Prisons**
*Federal Detention Center*
*Miami, Florida  33132*

Date: 5/27/24     **INFORMAL RESOLUTION**

Inmate Name: Julia Teryaeva-Reed  Reg. No. 57914 037  Unit: 5AE

**NOTICE**:  You are advised that prior to filing a Request for Administrative Remedy (BP-9), you **MUST** attempt to informally resolve your complaint through your counselor.  Please follow the three (3) steps listed below.

1.     State your specific complaint: I am requesting to provide matresses of adequate size, to fix lightning system so it is adjustable and does not result in sleep deprivation, to give me a bottom bunk b/c I was given bottom bunk pass and there are no cells available due to plumbing issues, to fix elevators so we are not locked down because of maintenance issues

2.     State what efforts you have made to resolve your complaint: I sent electronic cop-out to Warden, Ms Serrano, on 4/30/24, spoke to counselor Jones and Captain, Mr. Taylor during the AcO.

3.     State what resolution you request: same as #1 - I am asking to improve living conditions because they are the same as in the SHU - punitive confinement but I violated No BOP policy to be subjected to punitive living conditions.

Inmate Signature: Without Prejudice     Date: 5/27/24
All Rights Reserved

Correctional Counselor's Comments: _____

_____

_____

_____

_____

Correctional Counselor Signature:_____ Date:_____

Unit Manager's Comments:_____

_____

_____

Unit Manager's Signature:_____ Date:_____